# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SUNLINE COMMERCIAL CARRIERS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N15C-03-051 WCC CCLD |
| CITGO PETROLEUM CORPORATION, | ) ) ) ) | |
| Defendant. | ) ) | |

Submitted: July 20, 2017
Decided: December 27, 2017

**Plaintiff's Motion for Summary Judgment - GRANTED IN PART
Defendant's Motion for Summary Judgment - DENIED**

## MEMORANDUM OPINION

Michael F. Bonkowski, Esquire & Nicholas J. Brannick, Esquire, Cole Schotz P.C., 500 Delaware Avenue, Suite 1410 Wilmington, DE 19801. Attorneys for Plaintiff.

Ross A. Mortillaro, Esquire, Michael P. Aigen, Esquire, J. Michał Zapendowski, Esquire and Lawrence Lee Budner, Esquire, Lackey Hershman, LLP, 3102 Oak Lawn Avenue, Suite 777 Dallas Texas 75219. Attorneys for Defendant.

Mary F. Dugan, Esquire, Young Conway Stargatt & Taylor, LLP, 1000 North King Street Wilmington, DE 19801. Attorney for Defendant.

John Zavitsanos, Esquire, Debora Simon Pacholder, Esquire and Edward Goolsby, Esquire, Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C., 1221 McKinney Street, Suite 2500, Houston, Texas 77010. Attorneys for Defendant.

**CARPENTER, J.**

# I.  FACTUAL & PROCEDURAL BACKGROUND

On January 9, 2013, Sunline Commercial Carriers, Inc. ("Sunline" or "Plaintiff") and CITGO Petroleum Corporation ("CITGO" or "Defendant") entered into an Agreement for Motor Transportation Services (the "Master Agreement").[1] Under the Master Agreement, Plaintiff agreed to provide motor carrier services for the transportation of barrels of petroleum products provided by CITGO. The Master Agreement set forth Plaintiff's requirements to provide transportation services, insurance and liability provisions, and general invoicing procedures but it was silent on pricing and the minimum barrel requirements.[2] These terms were not defined until March 2013 in a separate one year agreement also titled Agreement for Motor Transportation Services (the "Term Agreement").[3]  The Term Agreement incorporated by reference the terms of the Master Agreement stating that "[t]o the extent of any inconsistent or conflicting terms between this Agreement and the [earlier] Master Agreement, this Agreement shall govern and control."[4]  Together, the Master Agreement and the Term Agreement operate together to form the parties' contract (the "Contract").

---

[1] *See* Compl. at ¶4; Pl.'s Ex. A-1 at CITGO 000159.
[2] *See* Pl.'s Ex. A-1 at CITGO 000159.
[3] Pl.'s Ex. A-2 at CITGO 0002493.
[4] *Id.*

1

Pursuant to the Term Agreement, Defendant was required to use Plaintiff's transportation services to ship a specified monthly minimum number of barrels. If Defendant was unable to provide the specific monthly minimum of barrels, the Defendant was required to pay Plaintiff "$3.33 plus an agreed fuel service charge of 28%" for each barrel it failed to provide.[5] Defendant's failure to satisfy the monthly minimum barrel requirements was deemed a shortfall and each shortfall payment was due fifteen days after receipt of Plaintiff's invoice.[6] Appendix A of the Term Agreement provided a detailed schedule of the minimum barrel requirements that the Defendant was required to provide and the Plaintiff was obligated to ship. For example, beginning April 2013, Defendant was required to provide a guaranteed monthly minimum of 100,000 barrels and Plaintiff's corresponding shipment obligation was 100,000 barrels that month.[7] In May 2013, the minimum barrel requirements increased to 180,000[8] and after June 1, 2013, Defendant's guaranteed monthly minimum and Plaintiff's corresponding shipment obligation was a continuous 240,000 barrels.[9]

As early as June 2013, the number of barrels provided by Defendant fluctuated and fell short of the parties' expectations. In fact, after only three months into the

---

[5] *See* Pl.'s Mot. Summ. J. at 5.
[6] Pl.'s Ex. A-2 at CITGO 0002495.
[7] *See id.*
[8] *See id.*
[9] *See id.*

2

Term Agreement, Defendant was unable to supply the guaranteed monthly minimum of 240,000 barrels and often failed to pay the associated shortfall fees. The chart below illustrates the shortfall amount, the shortfall obligation, and if the Defendant satisfied such obligation.[10]

| Month | Shortfall Barrels | Shortfall Obligation | Shortfall Obligation Met? |
|---|---|---|---|
| June 2013 | 97,595 | $415,989 | No |
| July 2013 | 81,477 | $347,288 | No |
| August 2013 | 143,372 | $611,109 | No |
| September 2013 | 50,410 | $214,445 | No |
| December 2013 | 49,607 | $211,445 | No |
| February 2014 | 16,402 | $69,912 | Yes |
| March 2014 | 96,085 | $409,553 | Yes |

Because of these early and recurring shortfalls, the parties began to discuss how Defendant could meet its obligations. Defendant proposed pushing all shortfall barrels and obligations to the end of the Contract term. Plaintiff, however, was only willing to move some of the shortfalls to the end of the Contract, if and only if the Defendant paid a portion of the shortfall obligations each month, which would cover the Plaintiff's expenses. Plaintiff's President Mr. John Flinn ("Mr. Flinn") told Defendant in an email on October 15, 2013, that Sunline "did not want to lose this business [] but [they] did not know what else to do."[11] Plaintiff continued to remind

---

[10] Pl.'s Compl. at ¶4.
[11] Def.'s Ex. 49 at CITGO 002179.

Defendant of Sunline's cash loss but wanted to try to figure out a solution. Plaintiff also told Defendant's Senior Hydrocarbon Trader Jones Khan ("Mr. Khan"):

> Let me know what CITGO decides as losing the business over something I did not cause is difficult for me to understand. I thought our proposal was fair considering the size of the full amount and I do not have deep enough pockets to absorb August as I did in June and July.[12]

In October 2013, while many of Plaintiff's invoices remained unpaid, the Defendant proposed extending the term of the Term Agreement an additional month to April 30, 2014, and paying 30% of its shortfall obligations up front, and pushing the remaining 70% to the end of the extended contract term.[13] Such discussions continued for two more months with no agreement.[14]

Since there is no written document, it is still unclear to the Court exactly when a modification was finally agreed upon, however; the parties seemed to have reached some understanding around December 2013 for the outstanding shortfall obligations for June, July, August, and September 2013.[15] The modification required Defendant to pay 20% of the existing shortfall obligations, and push the remaining 80% of the shortfall obligations to a later date at the end of the Contract ("20/80 Modification").[16] Unfortunately whatever was agreed to was not set forth in a formal

---

[12] *Id.*

[13] Def.'s Ex. 50, at CITGO 002566–67 (providing copy presentation from Defendant regarding proposed contract modification).

[14] *See* Pl.'s Ex. A-23 at CITGO 002361–62.

[15] *See* Pl.'s Ex. A-27 at CITGO 0000691–94.

[16] *See id.*

4

written contract, and there is a great deal of dispute regarding the parties' responsibilities and obligations and even the Contract's end date.[17]

To add further confusion to this relationship, in a series of email chains, Plaintiff appears to have automatically waived full payment for shortfalls incurred in December 2013 but refused to waive full payment for shortfalls incurred in February and March of 2014. More specifically, when the Defendant failed to meet its minimum monthly barrel requirements in December, it seems without any additional discussions, Plaintiff applied the 20/80 Modification to the December invoice.[18] However, in February and March of 2014, when Defendant also failed to meet its minimum monthly barrel requirements and incurred additional shortfalls, Plaintiff refused to accept anything but full payment.[19] In fact, Mr. Flinn stated "it does look like I permitted a shortfall adjustment in December for 20% cash payment and 80% to be made up[,] however I am unaware of any waiver given by me for February."[20] As such, Defendant paid the shortfalls in February and March in full.

In February, it also appears the parties engaged in an additional round of discussions regarding how to handle shortfalls. While a "proposal" from CITGO is mentioned in email exchanges, a copy of Defendant's proposal has not been

---

[17] Flinn Dep. 124:9–18 Sept. 21, 2016.
[18] *See* Pl.'s Ex. A-35 at CITGO 000187.001.
[19] *See* Pl.'s Ex. A-29 at CITGO 000061–63.
[20] *See* Pl.'s Ex. B-6 at SUNCIT00533–36.

provided to the Court and it appears no formal agreement was reached. There are email exchanges critiquing Defendant's proposal, where Defendant's representative Mr. Khan ultimately responded to Plaintiff:

> [t]here are couple of minor changes we'll need to make. Otherwise, all looks good. Term and Termination: The term of this Agreement (the "Term") shall commence as of April 1st, 2014 and shall terminate on April 30, 2014. Each party will have the option to extend the contract for the month of May 2014 by giving an advance written notice on or prior to April 1, 2014. There is a reason for using this kind of language. Let me know what you think. [21]

However, there was no response by Plaintiff provided in either parties' discovery.

On March 31, 2014, Defendant sent Plaintiff its 60-day notice of termination. Defendant's termination notice stated that "[t]he transportation services, therefore will continue thru the month of May, ending on May 31st, 2014."[22] The parties disagree whether Defendant was required to provide the monthly minimum barrel requirements for April and May of 2014 or if those months acted simply as a make-up period for the remaining shortfall obligations. Defendant believed no monthly minimums were required and Mr. Khan provided Mr. Flinn with a copy of Defendant's attorney's discussions in a May 29, 2014 email:

> [t]he subsequent agreement on a new one-month term for April 2014 trumps the 60-day cancellation notice. There was no agreement for a one-year extension nor does the 3/21/13 agreement provide for one. In order to renew the agreement, there was a condition that must be met:

---

[21] *See* Pl.'s Ex. A-55 at CITGO 000032–33.
[22] *See* Pl.'s Ex. A-30 at CITGO 000066.

'If both parties agree on terms and volumes, this Agreement will be renewed with the agreed upon start date and term of the Agreement.' That condition precedent was not met. Additionally, there is nothing in the 3/21/13 agreement that indicates any renewal must be on a one-year basis. The agreement specifically contemplates that the parties will need to agree upon a start date and term. The agreement does state that there will be a 60-day notice to terminate and Mr. Khan honored that intent by providing a 60-day notice even though the agreement was currently on a one-month term. We did not specifically agree on any terms and volumes (including minimums) for April and May. The only term we agreed on was to use up the adjusted shortfall bbls until such time that volume has been exhausted.[23]

Plaintiff asserts the opposite, that there were minimum monthly requirements for both April and May. In fact, on May 12, 2014, Plaintiff sent an invoice to Defendant for the April shortfall and Defendant did not pay that invoice.[24] Plaintiff also responded to Defendant's May 29, 2014 email stating:

...[s]o that the record is clear, we do not agree with Citgo's interpretation of the two Agreements for Motor Transportation Services or the subsequent agreement theory advanced. Mr. Benson made that clear as well in his email dated April 3, 2014. While we sort through those issues in due course, I do need Citgo to address the numerous invoices that Citgo is currently past due on. The agreement(s) payment terms are for 15 days from invoice receipt and Citgo is behind $396,585, the shortfall invoice we have been discussing is not in the number past due. Please advise on when Sunline can expect payment on its past due obligations?[25]

---

[23] Pl.'s Ex. A-40 at CITGO 001322–23.
[24] *See* Pl.'s Ex. B-7 at SUNCIT 005497–005500.001.
[25] Pl.'s Ex. A-40 at CITGO 001322.

Similarly, on June 25, 2014, Plaintiff sent an invoice to Defendant for the May shortfall and Defendant did not pay that invoice.[26] Despite receiving Plaintiff's invoices, Defendant continues to assert after March 31, 2014 the minimum barrel requirements terminated and Defendant was only required to pay its shortfall balance of 337,969 barrels accrued as of March 31, 2014.[27] It is unclear whether Defendant made any effort to address, through payment or providing additional barrels, the remaining 80% shortfall in April and May of 2014.

Pursuant to the Contract's notice and cure provision, Plaintiff provided Defendant notice of its breach, giving CITGO 30 days to cure.[28] Defendant failed to cure and has yet to pay Plaintiff the alleged shortfall payments.[29] On March 6, 2015, Plaintiff commenced the instant action alleging breach of contract by Defendant and seeking damages of $1,904,371.[30] On April 28, 2015, Defendant replied and filed counterclaims alleging breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing by Plaintiff, and seeking an accounting and the return of amounts by which Defendant overpaid.[31]

Plaintiff replied to Defendant's counterclaims on May 18, 2015, and moved to dismiss two of Defendant's counterclaims. The Court dismissed Defendant's

---

[26] *See* Pl.'s Ex. B-8 at SUNCIT 005484–86.
[27] Pl.'s Ex. A-55 at CITGO 000032–33.
[28] Pl.'s Ex. A-33 at CITGO 000378–80.
[29] *See* Pl.'s Mot. Summ. J. at 11.
[30] *See id.*; *see also* Compl. at ¶25.
[31] Def.'s Answ. Affirmative Defenses and Countercls. at 18–21.

accounting claim but allowed the unjust enrichment claim to proceed. During the Motion to Dismiss hearing, "the Court noted that the disputes between the parties regarding the scope of discoverable information stemmed from the parties' differing positions on whether there is a liquidated damages provision in the parties' contract."[32] The Court then required the parties to submit additional briefing on the liquidated damages issue.[33] After reviewing the parties' briefings, the Court concluded that the damages calculation was straightforward and clear and no liquidated damages clause existed.[34] With the Court's decision on liquidated damages, the parties engaged in additional discovery. Defendant filed a Motion for Leave to File its Answer With Amended Affirmative Defenses and Amended Counterclaims, which was granted by the Court in November 2016. Plaintiff subsequently filed its Motion for Summary Judgment and Defendant filed its own Motion and responded to Plaintiff's Motion.

At the Motion for Summary Judgment hearing, the Court denied Defendant's Motion for Summary Judgment in regards to Count I and Count II, finding Defendant's assignment and lack of capacity arguments to be unpersuasive.[35] The Court reserved decision on Plaintiff's Motion for Summary Judgment based on

---

[32] Def.'s Mot. Summ. J. at 2.
[33] *See* Mot. Dismiss Tr. 17, Feb. 24, 2016.
[34] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, Del. Super., C.A. No. N15C-03-051 WCC - CCLD, Carpenter, W. (May 27, 2016) (Letter Op.).
[35] Mot. Summ. J. Tr. 97, July 20, 2017.

breach of contract, as well as Defendant's Motion for Summary Judgment for Count III, whether an expert is needed to testify on damages.[36] The Court reserved judgment on Count III, so Plaintiff could provide the Court more information regarding Mr. Flinn's 30(b)(6) deposition and ability to testify at trial. Plaintiff issued a letter to the Court on July 26, 2017 after reviewing Mr. Flinn's deposition and continued to assert his competency regarding the damages model and as a live witness at trial.[37] On November 30, 2017, the Defendant abandoned its counterclaims against Plaintiff, therefore making Plaintiff's Motion for Summary Judgment regarding Defendant's counterclaims moot. This is the Court's decision on the parties' remaining cross-motions for summary judgment.

## II. STANDARD OF REVIEW

The Court will grant summary judgment pursuant to Delaware Superior Court Civil Rule 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[38] In reviewing a Rule 56 motion, the Court must consider the facts in a light most favorable to the non-moving party.[39] The Court will deny summary

---

[36] *See id.* at 98.
[37] Def.'s Mot. Summ. J. at 34.
[38] Super. Ct. Civ. R. 56(c).
[39] *See Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del. 1990).

10

judgment where the record before it "reasonably indicates that a material fact is in dispute or 'if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.'"[40] This well-established standard is not altered where, as here, the parties have filed cross-motions for summary judgment.[41] "When cross-motions for summary judgment are presented to the Court, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[42]

## III. DISCUSSION

The parties' motions for summary judgment center on when the Contract ultimately terminated, if a binding oral modification existed, and the obligations of the parties thereunder. Plaintiff argues that the Contract terminated on May 31, 2014, pursuant to Defendant's 60-day notice given on March 31, 2014.[43] Plaintiff argues such notice obligated Defendant to meet the minimum barrel requirements until the end of May. [44] In contrast, Defendant argues that the Contract terminated

---

[40] *See Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008) (quoting *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962)).

[41] *See Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001)).

[42] *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Rhone-Poulenc Basic Chems. Co.*, 1992 WL 22690, at *5 (Del. Super. Ct. 1992) (quoting *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988)), *aff'd sub nom, Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992).

[43] Pl.'s Reply to Def.'s Answ. Resp. Pl's Mot. Summ. J. at 5.

[44] *Id.*

11

on March 31, 2014, because the one-year term of the Term Agreement expired.[45] However, pursuant to the parties' oral modification, April and May of 2014 operated as a two-month period for the Defendant to make up the remaining shortfall obligations.[46]

Plaintiff also contends that the Contract is unambiguous and Defendant's repeated failures to meet the monthly minimum barrel requirements and pay any shortfall obligations constitute a breach of contract and entitle Plaintiff to summary judgment.[47] Defendant, on the other hand, seeks summary judgment because Plaintiff has failed to provide a proper witness to testify as to the damages it claims.[48] The Court will first address the written contract provisions and determine when the Contract terminated. It will then turn to the alleged oral modification and the issue regarding a damage expert.

### A. The Contract

The elements of a breach of contract claim are: (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages.[49] When interpreting a contract, the Court will give effect to all provisions contained

---

[45] Def.'s Answering Br. Opp'n to Pl.'s Mot. Summ. J. at 6.
[46] *Id.*
[47] Pl.'s Reply to Def.'s Answ. Resp. Pl's Mot. Summ. J. at 5.
[48] Def.'s Mot. Summ. J. at 33.
[49] *See VLIW Tech., LLC*, 840 A.2d at 612.

in the contract's four corners.[50] The Court must discern the parties' intent based on the parties' words and the plain and ordinary meaning of those words.[51] In doing so, the Court measures the intent based on what a reasonable person in the same or similar circumstances of the parties would have thought the contract language means.[52]

"The proper construction of any contract…is purely a question of law."[53] If the contract terms are ambiguous, the Court may consider extrinsic evidence.[54] If the contract terms are unambiguous, the Court must interpret the disputed term(s) using only the contract itself. The Court will not find a contract term or phrase to be ambiguous "merely because the parties dispute its proper construction."[55]

In fact, if the issue before the Court is simply conflicting interpretations of a contract, and "one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute[.] [T]he court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation."[56]

---

[50] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).
[51] *Lorillard Tobacco Co. v. Amer. Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).
[52] *Rhone–Poulenc*, 616 A.2d at 1195–96.
[53] *Id.* at 1195.
[54] *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at *4 (Del. Ch. 2013).
[55] *Charlotte Broadcasting, LLC v. Davis Broadcasting of Atlanta, L.L.C.*, 2015 WL 3863245, at *3 (Del. Super. Ct. 2015).
[56] *Wills v. Morris, James, Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. 1998).

13

The parties do not dispute, for purposes of the present motions, that the elements of an existing contract are satisfied. Rather, they disagree as to how specific terms of the Contract should be interpreted, and if a subsequent modification was made.

Before addressing the issues raised by the parties, it is clear to the Court that the documents provided reflect that the interest of an oilman and a trucker were more critical and paramount to the drafting of those documents than ensuring that they were legally sound. While a step up from an oral agreement and a handshake (which appears later in this Opinion), these documents lack the clarity that should be expected in such a relationship, particularly when it involves a corporation the size and significance of Defendant. That said, the Court first finds that the Contract is not so ambiguous to require resorting to extrinsic evidence. The Court is able to read the Term Agreement and the Master Agreement together and reach reasonable conclusions as to the parties' intentions set forth in those writings. The fact that these documents do not rise to a level that the Court would expect is not fatal to the Court's interpretation.

While there is a dispute regarding the parties' obligations in April and May 2014, there appears to be no dispute regarding Defendant's failure to provide the minimum monthly barrel requirements in June, July, August, September, and

14

December of 2013 and February, and March of 2014.[57] Some accounting issues for these time periods may remain but it is clear that Defendant did not meet its obligations under the Contract for those months. So the real issue here is what the parties' obligations were under the Contract in April and May of 2014. Plaintiff asserts that the termination language in the Term Agreement is clear and required Defendant to provide written 60-day notice before its obligation to provide the monthly minimum barrels ended. Because Defendant sent termination notice on March 31, 2014, Plaintiff argues that Defendant was obligated to provide 240,000 barrels in both April and May 2014.[58] To support this continued obligation, Plaintiff relies on the "Termination" provision and the "Volume/minimum" provision of Appendix A of the Term Agreement.[59] Plaintiff asserts that these provisions provide the most specific language of termination and control over other general provisions.

Specifically, Plaintiff contends the "Volume/minimum" provision creates an indefinite obligation for Defendant to provide 240,000 barrels per month as of June 1, 2013 as the provision has no specific end-date.[60] Similarly, the

---

[57] *See* Pl.'s Mot. Summ. J. at 14.

[58] *See* Pl.'s Reply to Def.'s Answ. Resp. Pl's Mot. Summ. J. at 5.

[59] "Term of Agreement: 1 Year agreement with a start date of April 1, 2013. Both parties agree to review terms 60 days prior to expiration date and review pricing and volumes. If both parties agree on terms and volumes, this Agreement will be renewed with the agreed upon start dalte and term of agreement.
Termination: Termination of the Agreement by either party must be given at least 60 days prior to the expiration of the Agreement in writing." Pl.'s Ex. A-2 at CITGO 002494–96.

[60] *Id.* at CITGO 002496.

15

"Termination" provision does not include a specific end-date, instead termination requires a party to provide 60 days' written notice prior to the expiration of the Agreement.[61] Plaintiff argues, this continued obligated coupled with the 60 days' written notice, requires the Defendant to provide minimum barrel requirements "until the Master Agreement [] expired [in December 2014] or was terminated [sooner by 60 days written notice]."[62] Further, Plaintiff argues that both parties understood this reading of the Term Agreement and provides a CITGO internal email that acknowledges such understanding:

> the contract actually states that we have to give 60 days['] notice prior to the EXPIRATION (CITGO's emphasis) of the contract. The contract expires on April 1, 2014. So, even with 60 days['] notice we are committed to the contract till at least April 1, 2014.[63]

Defendant, in response to Plaintiff's Motion for Summary Judgment, presents a different understanding of the Term Agreement. Defendant relies on the "Term of Agreement" provision to assert that the Term Agreement began on April 1, 2013, and expired on March 31, 2014, along with Defendant's monthly minimum obligations.[64] In order for the Term Agreement to continue past March 31st, the "Term of Agreement" provision required "both parties [to first] agree on terms and volumes, [and then the Term Agreement] [] will be renewed with the agreed upon

---

[61] Id.

[62] Pl.'s Reply to Def.'s Answ. Resp. Pl's Mot. Summ. J. at 5.

[63] Pl.'s Ex. A-4 at CTIGO 000593–96.

[64] Def.'s Answering Br. Opp'n to Pl.'s Mot. Summ. J. at 6.

16

start date and term of [the] agreement."[65] Defendant argues this language on how to extend the Term Agreement is more specific than the language in the "Termination" provision which simply implements a notice requirement. As such, since the parties never came to an agreement regarding terms and volumes nor did they have an agreed upon new start date, the Term Agreement was not renewed.[66] Defendant contends that the remaining two months in 2014 were therefore only governed by the Master Agreement and were designed for Defendant to handle the remaining shortfall barrels.[67] The Court will first review the consequences to the parties of their initial contractual agreement.

As discussed above, in January of 2013 the parties executed the Master Agreement which set forth a general understanding that Plaintiff would provide trucking services for Defendant and Defendant would utilize those services to transport its petroleum products. To the Court the Master Agreement appears to be no more than a formal engagement letter, which set forth the basic requirements for insurance, liability, and some invoicing procedures. It was not intended to set forth the parameters of the specific services and obligations of the parties. As a result, the Master Agreement was silent on pricing, any agreed upon monthly minimum barrel requirements, and any guarantees for either party regarding trucking services or

---

[65] Pl.'s Ex. A-2 at CITGO 002494.
[66] Def.'s Answering Br. Opp'n to Pl.'s Mot. Summ. J. at 6.
[67] See id.

17

providing petroleum products to transport. The Master Agreement was to be effective until December 31, 2014 unless terminated by either party with 60 days' written notice.

Subsequently on March 18, 2013, the parties entered into the Term Agreement that for the first time established agreed-upon pricing and the Defendant's guarantee to provide a minimum number of barrels per month for Plaintiff to transport. The Term Agreement had an effective date of April 1, 2013 and was for a period of one year with no guaranteed renewal period beyond March 31, 2014.[68] To avoid any disputes with the Master Agreement, the Term Agreement specifically reflected that any inconsistency between the Master Agreement and the Term Agreement would be controlled by the Term Agreement.[69]

Based upon these contractual documents, the Court finds Plaintiff and Defendant had a one-year agreement from April 1, 2013 to March 31, 2014 for Plaintiff to provide transportation services for a guaranteed minimum amount of petroleum products which Defendant was obligated to provide. However, if there was no agreement to modify the Term Agreement before March 31, 2014, the Term Agreement by its own terms expired. Therefore, the Court finds that as of March 31, 2014, CITGO had no obligation to supply petroleum products to Plaintiff

---

[68] Pl.'s Ex. A-2 at CITGO 002494 (stating that the Term Agreement will only be renewed if both parties can agree on new terms and volumes).
[69] Pl.'s Ex. A-2 at CITGO 002493.

nor did Plaintiff have any obligation to provide transportation for those products. The Court finds the Plaintiff's 60-day notice argument from the "Termination" provision of the Term Agreement is simply unprevailing. Once the one-year term ended, so did any obligation under the Term Agreement. In this case, neither party "terminated" the Term Agreement, it simply ended by its own terms.

As such, if there was no other agreement between the parties, all monthly minimum barrel requirements ended on March 31, 2014 and CITGO would only be liable for the minimums it failed to meet during the one-year term. The Court agrees that while the Term Agreement ended on March 31, 2014, the Master Agreement would have continued until December 2014 if no notice of termination was given. However, that agreement placed no obligation on the parties to use each other's services because it was merely a formal engagement document with no enforcement provision. Therefore, the Court finds the Term Agreement had expired on March 31, 2014, and at most, the 60 days' notice provided by CITGO, that same day, only related to its continued relationship under the Master Agreement. Again, since there was no pricing or minimum set forth in the Master Agreement, Defendant was under no obligation to meet monthly minimum barrel requirements in April or May of 2014 pursuant to that document.

Unfortunately, this does not end the dispute. Because CITGO continually failed to meet the minimum barrel requirements set forth in the Term Agreement. It

19

appears this caused the parties to orally agree to a continuation of the relationship for an additional two months. As such, the Court must now determine what was agreed to by the parties.

The only legal basis for Plaintiff arguing that Defendant had a continuing obligation in April and May of 2014 to continue to meet the minimum requirements was its interpretation of the Term Agreement and the 60-day notice language in the "Termination" provision. As mentioned previously, Plaintiff asserted that since the 60-day notice was not given until March 31, 2014, the minimum obligation set forth in the Term Agreement continued into April and May. Unfortunately for Plaintiff, that interpretation of the Term Agreement has been rejected by the Court. Since the Court has held the end of the Term Agreement to be March 31, 2014, all that remains is an undisputed agreement between the parties that during the months of April and May of 2014, CITGO would make up the shortage during these months either by providing petroleum products for Plaintiff to transport or monetarily making up the difference. There is ample correspondence between the parties to demonstrate a willingness and a mutual assent to move the 2013 shortages to the end of the Term Agreement.[70] It is equally clear Plaintiff's willingness to do so was motivated by its

---

[70] *See e.g.,* Pl.'s Ex. A-14 at CITGO 001860 (showing Defendant's understanding that outstanding shortfalls be pushed to end of contract); *see also* Pl.'s Ex. A-52 at CITGO 001447; *see* Flinn Dep. 176:1–25, Jan. 27, 2016 (stating parties intended outstanding shortfalls to be pushed to end of contract).

20

hope that this would lead to an extension of its business relationship with CITGO.[71] Defendant benefitted by being able to meet its shortfall obligations by shipping petroleum products instead of making a monetary payment. While this arrangement did not work out as expected by Plaintiff, it was able to continue to use its trucks and drivers at full operation for an additional two-month period.[72] The parties agree this was a binding agreed-upon obligation, so there is no need for the Court to explore whether it met the legal standard for an oral contract.[73] As such, to the extent there are any matters remaining to litigate, the Court believes they are limited to the extent of the shortages and what monetary payments have been made to compensate Plaintiff for them. There is no longer a need for a damage expert as asserted by Defendant, the issue of whether Plaintiff has appropriately mitigated those damages disappears and the case has been reduced to a simple accounting exercise. As such, this is a matter the parties should now easily resolve without further litigation.

The Court appreciates that this decision may be a particularly bitter pill for Plaintiff to swallow. CITGO failed to provide the petroleum products required under the Contract, and it also failed to timely pay Plaintiff for outstanding shortfalls. In response, Plaintiff attempted to accommodate the Defendant to obtain favorable

---

[71] *See* Def.'s Ex. 49 at CITGO 002179 (showing Plaintiff's desire to keep Defendant's business despite shortfalls).
[72] Michael Barret Dep. 22:10–23:15, Feb. 27, 2016.
[73] If the Court had to, it would have found there was sufficient consideration for an oral agreement.

status as its main hauling company. Instead of acknowledging Plaintiff's goodwill and continuing with the relationship, CITGO pulled out of the Contract. While this is all true, in reality Sunline is getting exactly what it contracted for. If Plaintiff thought there was another agreement, Plaintiff should have documented it. Because it did not, Plaintiff must live with the consequences of that conduct.

It is, however, also important for Plaintiff to appreciate it would have been extremely difficult to convince a jury that having failed seven months out of the twelve-month agreement to meet the minimum barrel requirements, CITGO would actually agree to continue that same pattern for another two months or longer with the shortage barrels added on top of the minimum. That is simply unrealistic and would have been an incredibly poor business decision.

That said, the Court also suggests it is time for CITGO to live up to its obligation and pay Sunline for the shortages. This is not only ethically the right thing to do, but it is a wise business decision. Defendant's performance under this contract was atrocious and reflected a total lack of corporate responsibility, and it is time for it to end this litigation.

## IV. CONCLUSION

While the Court has not ruled in a manner that provides all the relief requested by Plaintiff, it has found Defendant has breached the Contract and Plaintiff is entitled

to summary judgment as to the shortfalls unmet by the Contract. As such, Plaintiff's Motion is **GRANTED IN PART**. To the extent Defendant's Motion for Summary Judgment asserts that Plaintiff's Complaint should be dismissed due to the lack of an expert on damages, the Motion has been mooted by the Court's decision and is therefore **DENIED**.

IT IS SO ORDERED.

Judge William C. Carpenter, Jr.